IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

CASE NO. 5:20-CR-00080-M

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **OPINION AND ORDER** |
| v. ) | |
| ) | |
| ZAIRE TREVON ALEXA GUNTER, ) | |
| ) | |
| Defendant. ) | |

Before the Court is Defendant Zaire Trevon Alexa Gunter's ("Gunter") Motion to Suppress and Incorporated Memorandum of Law [DE 30]. Gunter moves to suppress all evidence discovered as a result of searches of his vehicle and residence in Raleigh, North Carolina, on September 20, 2019. Following briefing, the Court held an evidentiary hearing on November 16, 2020 at which the Court heard testimony and admitted evidence, including the arresting police officers' body camera footage. Now, fully advised, the Court finds suppression is not warranted and denies Defendant's motion.

**I.  Procedural History**

On February 6, 2020, Gunter was charged by indictment with (1) possession with the intent to distribute a quantity of marijuana in violation of 21 U.S.C. § 841(a)(1) ("Count One"); (2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) ("Count Two"); and (3) possession of a firearm that was in and affecting commerce, with knowledge he had previously been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924 ("Count Three"). DE 1. Gunter was arrested and appeared before Magistrate Judge Gates on March 4, 2020. DE 9. Judge Gates held a detention hearing on March 12, 2020

and granted the Government's motion for pretrial detention. DE 16, 17. Gunter has been granted several continuances for his arraignment [DE 19; DE 21; DE 23; DE 25; DE 28; DE 34], which is currently scheduled for the Court's January 5, 2021 term of court. Gunter filed the present motion on October 23, 2020 [DE 30], arguing that police officers' initial entry into his residence without a warrant violated his Fourth Amendment rights and, thus, all evidence seized following the unlawful entry must be suppressed. The Government filed its opposition on November 6, 2020 [DE 35], asserting that no violation occurred because exigencies existed warranting the officers' initial entry. The Court held an evidentiary hearing on November 16, 2020 [DE 36] at which two Raleigh police officers testified and both video and documentary evidence was admitted.

## II. Factual Findings

The Court finds the following facts after considering the testimony and evidence presented at the November 16, 2020 hearing.[1]

On September 20, 2019, the Raleigh Police Department received 911 calls from residents at an apartment complex at 3220 Walnut Creek Parkway in Raleigh, North Carolina. Govt. Ex. 2 at 6. The callers reported hearing male and female voices yelling at each other, and at one point, the female voice yelled, "stop hitting me!" *Id.* Raleigh Police Officers D. Scott, A. Dumonceau, and B. Merritt were dispatched to the address to investigate. *Id.*; *see also* Def. Ex. 4, Def. Ex. 7.

---

[1] Defendant's Exhibit A is a copy of the search warrant concerning law enforcement's encounter with Gunter on September 20, 2019 (hereinafter, "Ex. A"). Defendant's Exhibit 1 is body camera footage from the September 20, 2019, initial encounter with Patience Lynch from the perspective of Officer Dillon Scott (hereinafter, "Def. Ex. 1"). Defendant's Exhibit 2 is body camera footage from the September 20, 2019, encounter with Lynch and Gunter from the perspective of Officer Scott (hereinafter, "Def. Ex. 2"). Defendant's Exhibit 4 is an Incident Report completed by Officer Scott regarding the encounter with Lynch and Gunter on September 20, 2019 (hereinafter, "Def. Ex. 4"). Defendant's Exhibit 7 is an Incident Report completed by Officer Merritt regarding the encounter with Lynch and Gunter on September 20, 2019 (hereinafter, "Def. Ex. 7"). The Government's Exhibit 2 is an Incident Report completed by Officer Dumonceau regarding the encounter with Lynch and Gunter on September 20, 2019 (hereinafter, "Govt. Ex. 2").

2

Officer Scott arrived first and encountered the building maintenance supervisor, who directed the officer to the apartment at which he heard yelling. Def. Ex. 1. Scott approached the apartment, stopped to listen, heard nothing, and knocked on the door. *Id.* Patience Lynch ("Lynch") answered the door carrying an infant in her arms. *Id.* The officer noticed that she had been recently crying. Tr. 9: 7-11. Scott asked Lynch to step outside, told her a maintenance guy was walking by, and asked what was going on. Def. Ex. 1. Lynch walked outside, closed the door behind her, and said she had been talking on the phone. *Id.* Scott asked twice whether anyone else was in the apartment and Lynch answered no. *Id.* At this point, Officer Dumonceau arrived and Scott briefly turned off the audio to his body camera (*see id.*); he testified that he did not recall why the audio was turned off and that he informed Lynch he needed to check the apartment for anyone else. Tr. 28: 10-19. Lynch then said that her boyfriend was inside. *Id.* at 9: 15-24. Scott and Dumonceau both testified that they saw no indication that Lynch was injured. *Id.* at 30: 5-7; 54: 12-14. They also testified they could smell marijuana emanating from the apartment before entering it. *Id.* at 8: 11-14; 56: 9-14.

Officer Scott opened the door and walked toward the back of the apartment where he found Gunter sitting in a bedroom. Def. Ex. 2. Scott asked Gunter if he was okay and what he and Lynch were arguing about. *Id.* Gunter stood up and answered "nothing" and "just family stuff." Gunter approached the officer asking whether Lynch had allowed him to enter. *Id.* Scott answered in the affirmative and asked for Gunter's identification, which Gunter provided. *Id.* Scott then asked for Lynch's identification and she provided it. Scott asked Gunter and Lynch whether they were going to be home or were planning to leave; they both said they were leaving. *Id.* Scott handed his notes to Officer Dumonceau and told him to check the identifications; Dumonceau left the apartment and went back to his patrol vehicle. *Id.* At that point, Officer Merritt arrived and came into the

3

apartment to provide "cover." Tr. 35: 20-24. Scott waited outside the apartment for approximately one minute while Lynch put the infant in a stroller and left the apartment. Def. Ex. 2. Outside, Scott asked Lynch again whether she was "okay"; she responded that she was, and he let her go. *Id.* Scott went back to the apartment door and said to Merritt, "all's good"; Merritt left the apartment saying to Gunter, "have a good day now." *Id.* Notably, the officers did not search any enclosed spaces nor the persons of Gunter and Lynch. *See* Tr. 37: 16-23; 47: 21-25, 48: 1-2; 55: 22-24. All of the activity in the apartment during the initial entry was focused on investigating the domestic disturbance call and ensuring the safety of the occupants and officers. *Id.*

Officer Merritt went back to his patrol vehicle and drove away; Officer Scott stopped to get the maintenance supervisor's identification. Def. Ex. 2. The supervisor described the argument as "intense" and said that when he arrived, he could hear Lynch screaming repeatedly, "leave me alone!" *Id.* Scott walked to Officer Dumonceau's vehicle where he was reviewing Gunter's arrest history; Dumonceau told Scott, "he's definitely got a gun in there" and "could smell weed, too; might have to do a search." *Id.* Dumonceau explained that following a "shots fired" call, Gunter's car was searched and police found ammunition but no gun; another time Gunter was found with 32 grams of marijuana. *Id.* Dumonceau commented, "probably should search . . . still can." *Id.* Scott answered, "well, we can always go back in." *Id.* Scott walked back to the maintenance supervisor and returned his identification. *Id.* Dumonceau joined Scott who said, "let's go talk to [Gunter], see if we can get consent." *Id.*

The officers returned to the apartment; Scott knocked on the door and Gunter answered. *Id.* Scott asked for and received Lynch's phone number. *Id.* Scott then stated, "here's the deal - your apartment smells like weed . . . I'd like to search or if you have any in there, you can let me know about it." *Id.* Gunter answered, "I've got no weed." *Id.* Scott asked, "so, do you mind if

4

we search then?" *Id.* Gunter said, "yeah, I mind." *Id.* Scott informed Gunter that they were going to "lock down" the apartment and apply for a search warrant. *Id.* The officers followed Gunter inside the apartment and Scott asked whether Gunter had a gun on him; Gunter answered "no." *Id.* Scott then "frisked" Gunter and placed the contents of Gunter's pockets on the couch. *Id.* Dumonceau left the apartment to apply for a search warrant. *Id.*; Tr. 58: 16-22. After some time, Scott was alerted to an active arrest warrant for Gunter, so he handcuffed Gunter and informed him of the warrant. Def. Ex. 2.

In the affidavit attached to the search warrant application, Officer Dumonceau stated in part, "The strong odor of raw marijuana was observed while I was investigating a domestic dispute inside 3220 Walnut Creek Pkwy S Apt B. . . . Gunter was placed under investigative detention. . . . Gunter has an active arrest warrant, and was placed under arrest and subsequently searched . . ." which "yielded $2,064 cash" and "keys belonging to a white 1998 Toyota Camry . . . found parked in the parking lot directly in front of the building." Ex. A. The affidavit also stated that Officer Dumonceau "observed a green leafy substance" he knew "to be marijuana as well as a digital scale" inside the vehicle; a police K9 arrived on scene and "alert[ed] to the presence of narcotics inside the vehicle." *Id.* Finally, Dumonceau listed Gunter's criminal history including three charges in the previous six months for possession and possession with the intent to sell or distribute marijuana. *Id.* Wake County Magistrate C. Jones granted the application and issued the search warrant that day, September 20, 2019. *Id.*

Officers Scott and Dumonceau completed incident reports on September 20, 2019 following the encounter. Def. Ex. 4; Govt. Ex. 2. Scott noted information about his initial conversation with Lynch, including that she lied about whether anyone else was in the apartment. Def. Ex. 4. He did not note that he had smelled marijuana when he approached the apartment or

5

stood outside it; rather, Scott noted that "[a] search warrant was completed on the residence due to the odor of marijuana." *Id.* at 2. Dumonceau noted in his report that he received notice of the 911 calls on his way to the apartment complex, including the report that a female yelled, "stop hitting me." Govt. Ex. 2. He also stated that, "[w]hile standing outside of apartment B, I observed an odor of marijuana emanating from within apartment B" and "[u]pon entering apartment B, I observed the strong odor of marijuana throughout the apartment." *Id.* at 6.

### III. Legal Standards

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is reasonableness. To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014) (internal quotations and citations omitted).

Here, Gunter contends the officers' initial entry into his apartment without a warrant was unreasonable and violated his Fourth Amendment rights. An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed objectively, justify [the] action." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). A law enforcement officer's subjective motivation is irrelevant. *Id.*

Following *Brigham City*, the Fourth Circuit noted the Supreme Court had recognized a variety of specific circumstances that may constitute an exigency sufficient to justify the warrantless entry and search of private property. These circumstances include when officers must enter to fight an ongoing fire, prevent the destruction of evidence, or continue in "hot pursuit" of

6

a fleeing suspect. *United States v. Yengel*, 711 F.3d 392, 396–97 (4th Cir. 2013). "In addition to these well-established exigencies, the Supreme Court and this Circuit have held that more general 'emergencies,' if enveloped by a sufficient level of urgency, may also constitute an exigency and justify a warrantless entry and search." *Id.* (citation omitted); *see also Brigham City*, 547 U.S. at 43 ("Law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.").

"Under this more general emergency-as-exigency approach, for a warrantless search to pass constitutional muster, 'the person making entry must have had an objectively reasonable belief that an emergency existed requiring immediate entry to render assistance or prevent harm to persons or property within.'" *Yengel*, 711 F.3d at 397 (citation omitted). "An objectively reasonable belief must be based on specific articulable facts and reasonable inferences that could have been drawn therefrom." *Id.*

Regardless of the particular exigency proffered by the government, the Fourth Circuit has repeatedly applied the non-exhaustive list of factors first provided in *United States v. Turner*, 650 F.2d 526 (4th Cir. 1981), in determining whether an exigency reasonably justified a warrantless search. *Id.* The *Turner* factors include:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

*Id.* (quoting *Turner*, 650 F.2d at 528).

"As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence. Once the defendant establishes a basis for his suppression motion, the burden shifts to the government." *United States v. Adkinson*, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citations omitted). "If a defendant shows that he was subjected to a warrantless search, the burden of proof

7

is on the government to show by a preponderance of the evidence that the warrantless search was constitutional." *United States v. Miller*, No. 4:18-CR-54-FL-1, 2020 WL 3886301, at *8 (E.D.N.C. Jan. 13, 2020); *see also United States v. Toyer*, 414 F. App'x 584, 591 (4th Cir. 2011) ("The government bears the burden of demonstrating that exigent circumstances existed to overcome the presumption of unreasonable search and entry.").

**IV.     Analysis**

Gunter has met his burden in part to establish a basis for his suppression motion; that is, Gunter points to the undisputed fact that Officers Scott, Dumonceau, and Merritt initially entered his apartment without a warrant. In response, the government contends it was reasonable for the officers to enter the apartment on two bases: (1) to ensure that an emergency did not exist requiring the officers to render assistance or prevent harm to persons inside the apartment; and (2) to conduct a sweep based on the odor of marijuana. For the following reasons, the Court concludes that exigent circumstances existed in this case and, thus, there was no Fourth Amendment violation. The Court also finds that Gunter fails to meet his burden in seeking suppression of all discovered evidence by failing to identify the chain of causation necessary for application of the fruit-of-the-poisonous tree doctrine. Accordingly, the Court denies the motion to suppress.

A.     <u>No Fourth Amendment Violation</u>

The Court is keenly aware of the potential risk in expanding or over-applying exigency exceptions in such a way as to swallow the exclusionary rule. In fact, this year, the Fourth Circuit expressed its hesitation in applying the "emergency-as-exigency" exception to facts involving a *Terry* stop saying,

> Though the emergency-as-exigency approach may sound broad in name, it is subject to important limitations and thus is quite narrow in application. For example, the requirement that the circumstances present a true emergency is strictly construed—that is, an emergency must be enveloped by a sufficient level of

8

urgency. Indeed, standing alone, even a possible homicide does not present an emergency situation demanding immediate [warrantless] action.

*United States v. Curry*, 965 F.3d 313, 322–23 (4th Cir. 2020) (quotation marks and citations omitted). The Fourth Circuit has described the "intended role" of the Fourth Amendment as "the bulwark against 'overbearing or harassing' police conduct." *United States v. Wilson*, 953 F.2d 116, 126 (4th Cir. 1991) (citing *Terry v. Ohio*, 392 U.S. 1, 15 (1968)). The Amendment's warrant requirement "'ensures that the inferences to support a search are drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime,' and so safeguards 'the individual's interests in protecting his own liberty and the privacy of his home.'" *United States v. Brinkley*, -- F.3d --, 2020 WL 6685070, at *3 (4th Cir. Nov. 13, 2020) (quoting *Riley v. California*, 573 U.S. 373, 382 (2014) and *Steagald v. United States*, 451 U.S. 204, 212 (1981)). Mindful of these legal principles, the Court concludes Officers Scott, Dumonceau, and Merritt reasonably entered Gunter's apartment despite the absence of a warrant based on the exigencies that existed at the time.

        1.     Emergency-as-Exigency Exception

As set forth above, for a warrantless entry to override the Fourth Amendment's privacy concerns, 'the person making entry must have had an objectively reasonable belief that an emergency existed requiring immediate entry to render assistance or prevent harm to persons or property within.'" *Yengel*, 711 F.3d at 397. In this case, Officers Scott and Dumonceau were aware of the following facts when they arrived at Gunter's apartment: the Raleigh Police Department had received 911 calls from residents of the apartment complex complaining of yelling and screaming inside an apartment between a male and female, and the female yelled, "stop hitting me!" Thus, an objective police officer would believe that at least two people were involved in an altercation and that physical violence might have occurred or was occurring.

9

Officer Scott arrived first, approached the front door, stopped to listen, heard nothing, and knocked on the door. Lynch answered with a baby in her arms and she was sniffling as if she had been recently crying. She also had a cell phone in her hand and immediately told Scott she had been on the phone. Scott asked her to step outside and asked whether anyone else was inside. Lynch stepped outside and closed the door behind her; she responded in the negative and explained that she had been on the phone. Scott asked again if she was sure no one else was inside; Lynch answered no. Scott testified that he informed Lynch he needed to check inside to make sure everyone was safe (Tr. 10: 11-19); Lynch then stated that her boyfriend was inside. At this point, an objective police officer would know that a female, who did not appear to be injured, lied about whether anyone else was in the apartment from which the screams were heard.

Gunter argues that Lynch "came clean" when she admitted Gunter was inside and, thus, the officers should have knocked before entering the apartment. The Court disagrees; an objectively reasonable officer could believe it possible that Lynch's lie was to cover up improper or illegal activity, including physical harm to someone who was involved in the altercation. Rather than provide police officers with truthful information on which they could rely, Lynch's lie more likely would alert an objective officer to unknown, potential danger to another person or him- or herself.

Scott opened the door, walked into the apartment, and headed to the back bedroom where he found Gunter sitting on a bed. Gunter answered Scott's questions and asked whether Lynch had allowed the officers to enter; Scott responded in the affirmative. Gunter argues that Scott's response demonstrates his unreasonable conduct. Again, the Court disagrees; even if Lynch had affirmatively told the officers they could not enter the apartment (for which no evidence exists), the officers were dispatched to, and had knowledge of, a very recent domestic disturbance, which

10

Case 5:20-cr-00080-M   Document 38   Filed 11/25/20   Page 10 of 17

they reasonably believed may have involved physical violence. As the Supreme Court has determined:

> No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected.

*Georgia v. Randolph*, 547 U.S. 103, 118 (2006). Citing *Randolph*, the Fourth Circuit has acknowledged that "domestic violence presents a serious problem in the United States." *United States v. Staten*, 666 F.3d 154, 164 (4th Cir. 2011). In fact, in *Trull v. Smolka*, the court upheld a warrantless entry even though it concluded that "[t]he record does not show the officers had evidence of any violence at the scene. However, courts have recognized that domestic situations can escalate quickly: '[d]omestic disturbances have a low flash point, and 'violence may be lurking and explode with little warning.'" 411 F. App'x 651, 656 (4th Cir. 2011) (quoting *McCracken v. Commonwealth*, 39 Va. App. 254, 572 S.E.2d 493, 496 (2002)). In the case before this Court, the evidence shows that, minutes earlier, a female occupant of the apartment was reported to be screaming, "stop hitting me."

The Court finds the officers' initial entries into Gunter's apartment were justified by the existence of an emergency in the form of a domestic disturbance; based on the 911 calls and Lynch's lie regarding whether anyone was inside the apartment, the officers had objectively reasonable beliefs that they needed to enter immediately to determine whether someone was injured or otherwise needed assistance. *See Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (emergency aid exception "requires only an objectively reasonable basis for believing that a person

within the house is in need of immediate aid") (citations, brackets, and internal quotation marks omitted). The Court will deny Defendant's motion on this basis.

2. Destruction of Evidence Exception

Even if it were to find no emergency justifying the officers' warrantless entry, the Court finds the officers properly entered the apartment based on the odor of marijuana emanating from within. Possession of marijuana is a crime in North Carolina. *See* N.C.G.S. § 90-95(d)(4). Officers Scott and Dumonceau testified that they could smell marijuana coming from the apartment while standing outside at the apartment's front door and continued to smell it when they entered the apartment. *See* Tr. 8: 11-14; 13: 6-8; 15: 4-6; 53: 18-25, 54: 1; 56: 9-11; 57: 17-22.

The Fourth Circuit recently found that the "strong odor" of marijuana justified a warrantless protective sweep, and a burning marijuana cigarette found during the sweep constituted probable cause for a search of the entire house. *United States v. Jones*, 952 F.3d 153, 158 (4th Cir. 2020), *cert. requested* (July 31, 2020) ("we have 'repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place.'" (quoting *United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004)). Thus, "where police officers (1) have probable cause to believe that evidence of illegal activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a warrant, exigent circumstances justify a warrantless entry." *United States v. Cephas*, 254 F.3d 488, 494– 95 (4th Cir. 2001) (citing *United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981)).

In *Cephas*, a police officer smelled a strong odor of marijuana emanating from an apartment and pushed open the front door when the occupant tried to close it. *Id.* at 494. The Fourth Circuit determined the officer had probable cause to believe contraband – *i.e.*, marijuana – was inside the apartment and that a felony might be occurring; the court then determined the

officer's warrantless entry was justified by analyzing the *Turner* factors. *Id.* at 495. Likewise, here, an objectively reasonable officer who (1) was responding to a domestic disturbance in which physical violence may have been involved, (2) smelled marijuana upon his arrival at the apartment, (3) knew that the occupant who answered the door lied about the presence of anyone else in the apartment, and (4) knew that "marijuana is readily destructible" (*id.*) is justified in entering the apartment without a warrant.

Defendant argues that the officers' credibility is questionable given that (1) Officer Dumonceau was not standing near Gunter's front door when he first approached the apartment, (2) he stated in his affidavit supporting the search warrant that "[t]he strong odor of marijuana was observed while I was investigating a domestic dispute inside 3220 Walnut Creek Pkwy S. Apt. B." (Ex. A at 4); and (3) Officer Scott did not mention the odor of marijuana in his incident report, which he completed the same day as the encounter. The Court is not persuaded.

First, Dumonceau testified not only that he could smell marijuana emanating from Gunter's apartment when he was standing outside, he also could smell marijuana when he entered the apartment. Tr. 56: 9-14; 61: 5-7. Although Defendant makes much of the fact that Dumonceau, unlike Scott, was not standing next to the front door, the body camera footage reflects that he stood approximately five-to-ten feet from the door and closer to the front door of another apartment. Def. Ex. 2. The Court finds this distance and position permitted Dumonceau to determine, based on his experience and training, that the odor emanated from Gunter's apartment.

Second, Defendant contends that the word "inside" in Dumonceau's affidavit statement relates to where Dumonceau observed the odor of marijuana. While this may be a reasonable interpretation, the Court also reasonably construes the statement as reflecting that "inside" is where Dumonceau was investigating the domestic dispute. This second interpretation is made all the

13

more reasonable (and likely) given that Dumonceau noted in his incident report, "While standing outside of apartment B, I observed an odor of marijuana emanating from within apartment B." Govt. Ex. 2 at 6. The Court finds Dumonceau's affidavit is not inconsistent with his testimony.

Finally, Scott noted in his incident report that "[a] search warrant was completed on the residence due to the odor of marijuana . . . ." Def. Ex. 4. While this statement does not indicate that Scott smelled marijuana both inside and outside of the apartment, it is consistent with Scott's testimony. Moreover, again, Dumonceau, who stood outside the apartment only feet away from Scott and the front door, noted in *his* incident report that he could smell marijuana emanating from the apartment. Govt. Ex. 2 at 6. The Court finds no material inconsistencies in the officers' reports and, having carefully listened to their sworn testimony and reviewed the body-worn video, finds them to be credible.

Accordingly, the Court concludes that, even if no emergency existed justifying the officers' warrantless entry, they were justified in entering based on the possibility of illegal activity in the apartment. The Court finds the government has met its burden to demonstrate the existence of exigent circumstances supporting the officers' warrantless entry.

B.  Fruit-of-the-Poisonous-Tree Doctrine

As set forth above, Gunter met his burden to demonstrate a basis for the present motion by pointing to the officers' warrantless entry. He has failed to show a Fourth Amendment violation. However, even if the Court had found a violation of the Fourth Amendment, Gunter fails to establish that "all" evidence discovered in the search subsequent to the officers' entry is subject to suppression under the fruit-of-the-poisonous-tree doctrine.

Typically, "evidence derived from an illegal search or arrest is deemed fruit of the poisonous tree and is inadmissible." *United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2002)

14

(citing *Wong Sun v. United States*, 371 U.S. 471, 484–485 (1963)). However, "not all evidence conceivably derived from an illegal search need be suppressed if it is somehow attenuated enough from the violation to dissipate the taint." *Id.* The Fourth Circuit has instructed that "a direct, unbroken chain of causation is necessary, but not sufficient to render derivative evidence inadmissable." *Id.* To determine whether "the fruit is no longer poisonous," courts must consider several factors, including: "(1) the amount of time between the illegal action and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Id.* (citing *United States v. Seidman*, 156 F.3d 542, 548 (4th Cir. 1998)). "What suffices to dissipate the taint from derivative evidence depends on the specific facts and circumstances of each case." *Id.* (citation omitted).

Here, even if the Court had found a Fourth Amendment violation, the Defendant has identified no chain of causation supporting a finding that all evidence discovered during the subsequent search of Gunter's apartment pursuant to a warrant should be suppressed. The facts of this case reveal that the only new evidence discovered at the officers' initial entry was Gunter's name, which is not subject to suppression. *United States v. Dominguez*, 604 F.2d 304, 312 (4th Cir. 1979) ("A name is simply the appellation by which a person chooses to be publicly designated. 'What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.'") (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)). Gunter's name led to discovery of his criminal history, including recent charges related to marijuana possession. Gunter does not argue that his criminal history should be suppressed.

The history, coupled with the odor of marijuana emanating from the apartment, led the officers to request consent from Gunter to search his apartment. Gunter declined consent; thus, the criminal history and marijuana odor led to an application for a search warrant and to a protective

sweep of the apartment. Other than a conclusive request for suppression of "all evidence," Gunter makes no argument that either the search warrant application or the protective sweep violated the Fourth Amendment. During the application process, the officers discovered that Gunter had an active outstanding warrant for his arrest; Officer Scott placed Gunter under arrest and searched what he pulled from Gunter's pockets during the protective sweep. This search incident to arrest led to discovery of $2,064 in cash and a key to a Toyota, in which Officer Dumonceau observed "a green leafy substance" he knew to be marijuana and a digital scale. Gunter does not contend that Scott's discovery of the cash and vehicle key or that Dumonceau's observation inside the vehicle violated his First Amendment rights. A police K9 was dispatched to the complex, and the dog alerted to the presence of narcotics inside the vehicle. Gunter does not challenge the use of the K9 in this case. Thus, the odor of marijuana; Gunter's criminal history; the outstanding arrest warrant; the officers' observation of $2,064 in cash, a vehicle key, a green leafy substance, and a digital scale; and a K9 alert to narcotics in the vehicle supported the issuance of a search warrant for the vehicle and apartment, in which the officers discovered, *inter alia*, 176.3 grams of marijuana, two firearms, and ammunition. Govt. Ex. 2.

The Court concludes that even if it had found Officers Scott, Dumonceau, and Merritt violated Gunter's Fourth Amendment rights by entering his apartment without a warrant, the presence of intervening lawful circumstances and the officers' reasonable conduct demonstrate that the discovered evidence either is not subject to suppression or is "attenuated enough from [any] violation to dissipate the taint." *Najjar*, 300 F.3d at 477. Gunter's motion fails to establish the basis for suppression of the evidence seized pursuant to his lawful arrest and fails to demonstrate that the search warrant was the product of fruit of the poisonous tree.

16

## V. Conclusion

For the reasons discussed above, the Defendant's Motion to Suppress and Incorporated Memorandum of Law [DE 30] is DENIED.

SO ORDERED this 25th day of November, 2020.

*Richard E. Myers II*
RICHARD E. MYERS
UNITED STATES DISTRICT JUDGE